## F. S. Gray et al. v. Thomas E. Helm.

1. Deed of Trust. *On growing crops and personalty. To secure future advances. Validity and construction thereof.*

    On the 3d of May, 1880, M. executed a deed of trust reciting an indebtedness on his part to H. & L. on a promissory note, and that "whereas, said party of the first part expects said H. & L. to advance him money, supplies, and merchandise during the year 1880; and whereas, said party of. the first part has agreed to secure the payment of said note, as also any further amounts that may be advanced as aforesaid and not mentioned herein, the party of the first part, in consideration of the premises, as well as of $10 to him paid by G., trustee, hereby bargains, sells and conveys to said trustee the following described property situated in Hinds County, Mississippi, viz.: his entire crop of cotton and corn raised by him and hands he may employ during the year 1880 on land belonging to himself, or on any other land they may cultivate during said year; also any and all cotton and corn that may be due said party of the first part as rent for said year; also all stock now owned by said party of the first part, and used on the Whitaker and Watson places. It is further distinctly understood and agreed between the parties aforesaid that this deed is made and intended to secure any advances on account of the crop of 1880 made after the maturity hereof, and not mentioned herein." The debt secured by the deed of trust was to mature on the 1st of November, 1880. This deed of trust, after being duly recorded, operated as against creditors of M., to secure all advances made by H. & L. before the maturity thereof; but it covered only such advances made after its maturity as were directly connected with the growing, gathering, and handling of the crops.

2. Same. *Payments not covered thereby. Case in judgment.*

    In the case above stated drafts were drawn by third persons on M., for the price of mules and provisions sold prior to the maturity of the deed of trust, and partly before its execution, by such persons to M., and used by him in making the crops of 1880. These drafts were paid by H. & L. after the maturity of the trust-deed, upon the request of M.; but it did not appear by the proof that they had any connection with the purchase of the mules and provisions for which the drafts were drawn, nor that they ever knew of such purchase till after the maturity of the trust-deed. *Held*, that the payments on these drafts were not covered by the deed of trust.

3. Same. *Sale by trustee. Time allowed for advertising and other purposes. Expense of keeping stock.*

    The court instructed the jury in the case above stated, in effect, that it was the duty of the trustee to have sold the mules and horses on the tenth day after he took possession of them, that time being necessary for giving the required notice of sale, and that they should allow him for the expense of feeding the stock only for that length of time. *Held*, that this instruction was erroneous. The interests at stake being large, and the attachment sudden, the trustee should have been allowed ten days for investigating the attachment, for

consultation with the *cestuis que trust,* and for determining his course, and a like period for advertising the notice of sale.

APPEAL from the Circuit Court of Hinds County.

Hon. S. S. CALHOON, Judge.

The main question in controversy in this action depends upon the construction of a deed of trust, the premises and granting part of which are as follows: "This deed of trust, made this third day of May, A. D. 1880, witnesseth: That whereas Henry C. McPike, party of the first part, is indebted to Harrison & Lewis in the sum of sixty-eight hundred, nineteen and $\frac{32}{100}$ dollars, on his promissory note of even date herewith; and whereas, said party of the first part expects said Harrison & Lewis to advance him money, supplies, and merchandise, during the year 1880; and whereas, said party of the first part has agreed to secure the payment of said sum, as also any further amounts that may be advanced as aforesaid and not mentioned herein, the party of the first part, in consideration of the premises, as well as for ten dollars paid to him by F. S. Gray, trustee, hereby bargains, sells, and conveys to said trustee the following described property situated in Hinds County, Mississippi, viz. : his entire interest in any and all crops of cotton, corn, and other agricultural products raised by him and hands he may employ during the year 1880, on land belonging to himself or any other land they may cultivate during said year; also any and all cotton and corn that may be due said party of the first part as rent, for said year; also all stock now owned by said party of the first part, such as mules, horses, etc., now used on the plantations known as the Whittaker and Watson places; and any increase of property, real or personal, that may be hereafter acquired by purchase or otherwise." * * * "It is further distinctly understood and agreed between the parties aforesaid, that this deed is made and intended to secure any advance on account of the crop of 1880 made after the maturity hereof and not mentioned herein." The debt secured by this deed of trust was to mature on the 1st of November, 1880.

This deed of trust was duly recorded in the office of the chancery clerk of Hinds County, where the property therein described was situated, on the 9th of May, 1880.

In January, 1881, Thomas E. Helm sued out an attachment against H. C. McPike, on the ground of non-residence, which was levied on a large quantity of real estate, and much personalty, as the property of the defendant; and in August, 1881, a judgment was rendered in favor of the plaintiff for $6,400. But, on the 27th of January, 1881, before the rendition of the judgment in attachment, F. S. Gray, the trustee in the deed of trust above partially set forth, presented to the sheriff an affidavit claiming, as such trustee, one hundred and thirty bales of cotton, one hundred and nine mules, seven horses, and three thousand bushels of corn, which had been seized under the writ of attachment; and on the same day the sheriff delivered to him the property claimed, he having given the required bond. Gray, the trustee, kept the mules and horses in his possession until the 25th of April, 1881, when he sold them under the deed of trust; and, while in his possession he fed them thirty bushels a day of the corn which had been delivered to him as claimed. Upon the trial the court instructed the jury in the third instruction for the plaintiff, that upon taking possession of the mules and horses, it was Gray's duty "forthwith to publish a notice of sale and sell said mules and horses on the earliest day thereafter, so as to give the ten days' notice required, and it was lawful for him to feed to said mules and horses a reasonable amount of the corn attached for the period of ten days, and no longer."

The court instructed the jury in the first instruction for the plaintiff as follows: "The jury are instructed that the trust-deed under which F. S. Gray, the claimant, claimed the personalty levied upon under the attachment in this case, is only operative to secure the payment of the note therein specified, and the money, supplies, and merchandise furnished by Harrison & Lewis to H. C. McPike during the year 1880, and up

to the 1st of November, 1880, and advances on account of the crop of 1880 made after the 1st of November, 1880. These advances on account of the said crop include only bagging and ties, money to pay cotton pickers and discharge paramount liens in favor of laborers on the crop, supplies for the laborers engaged in harvesting and preparing the crop for market, and such other incidental expenses as are usual and proper in securing and preparing a cotton crop for sale, and do not include mere general debts of the grantor, McPike, which may have been paid for him by Harrison & Lewis after the 1st of November, 1880. In estimating the amount due Harrison & Lewis, and chargeable upon the cotton, corn, mules, and other personalty included in said trust-deed, and levied upon under the attachment, the jury will exclude the $8,252.42 paid out for McPike & Johnston's drafts on McPike after the 1st of November, 1880."

The only evidence as to the consideration for the drafts referred to in the above instruction, was contained in the testimony of H. C. McPike, who testified that they " were drawn on him by McPike & Johnston for payment of mules and plantation supplies, such as corn, meal, meat, flour, etc., in 1880, for making the crops in the year 1880 on the two plantations in Hinds County, Mississippi, which were cultivated by and for him during that year, and were used for such purposes. Some of the mules were bought before the execution of the trust deed to Gray, and were included in it." The drafts were paid as stated by Lewis, of the firm of Harrison & Lewis, " between the 5th of November, 1880, and the 17th of December, 1880."

In accordance with the instructions of the court, the jury returned a verdict in favor of the plaintiff in attachment for $3,416.87, as " the excess of the proceeds of sale of cotton, mules, and horses attached, over and above the amount due Harrison & Lewis under their trust-deed, and for $2,025 as the value of the " corn left after the feeding of the mules and horses attached." From the judgment upon this verdict, the claimant and the sureties on his claimant's bond appealed.

*Mayre Dabney*, for the appellants.

The appellants insist that the deed of trust secured all advances made to McPike by Harrison & Lewis, whether before or after the 1st of November, 1880. Leaving out of consideration for a moment the concluding clause of the deed of trust, how would this question stand? All advances made during the year 1880 were to be secured ; but if all due on November 1st shall have been then paid, the instrument was to be void, and if not paid it would follow that the instrument remained in force for all of its apparent purposes, among which was the security for advances to be made up to January 1, 1881. Unless, therefore, the concluding clause of the deed of trust limits the rights of Harrison & Lewis under that instrument, all advances made under it up to January 1, 1881, are secured by it. The distinguished judge of the Circuit Court held that the clause referred to was a limitation upon the rights of Harrison & Lewis, acquired under the previous provisions, and of this we predicate error. Manifestly, this concluding portion of the instrument was a saving clause, to meet a contingency which might, and in point of fact, did arise, viz. : the necessity for further advances on account of the crop of 1880, after the maturity of the instrument, and not mentioned herein. Money, supplies, and merchandise for the whole year 1880 are mentioned therein, but such advances on account of the crop might be necessary after the year 1880, as was the case, since it appears in the testimony of Lewis and Bullock, that advances for getting out the cotton, hauling it, etc., were made in 1881, and such advances were admitted by plaintiff's counsel below to be correct, and the cotton was not fully gathered before March, 1881. The case of *Witcyinsky* v. *Evermon*, 51 Miss. 841, is directly in point and fully sustains my position. As to future advances generally, see 1 Jones on Mort., sects. 364, 365, 367 and 368. In addition to the foregoing views, it is stated by McPike in his testimony, that the drafts drawn on him and paid by Harrison & Lewis, between November 5 and December 17, 1880, were for plantation sup-

plies, mules, etc., bought by him that year, and before November 1, 1880.

*Mayre Dabney*, also argued the case orally.

*T. J. & F. A. R. Wharton*, on the same side.

We submit that it will readily appear to the satisfaction of this court, upon a careful examination of the language used in this deed of trust, that the construction put upon it by the court below is directly opposed to and in conflict with the plain and unambiguous language therein used. That such advances of money, supplies and merchandize were not intended to be so restricted and used by McPike in the raising of his crops, " during the year 1880," and that McPike was not in any manner so limited in the application or use of such future advances ; that, on the contrary, it is manifest that the understanding between McPike and Harrison & Lewis was that the object and purpose of executing such deed of trust was as a basis of credit to be used by McPike with Harrison & Lewis " during the year 1880," — that is during the entire year of 1880, and up to the first day of January, 1881, — without any limitation as to the amount of such future advances, or as to the use to be made of them by McPike. Under the terms of this deed of trust Harrison & Lewis were as much bound to make such future advances of " money, supplies, and merchandize " to McPike during such remainder of the year 1880 as he might demand of them, and for such use of them as he might choose to make, as McPike was bound to provide for their payment. Even if advances of money by Harrison & Lewis after November 1, 1880, would not constitute a lien on the property conveyed by this deed of trust, unless on account of the crops of 1880, still the court erred in instructing the jury, in the first instruction given on behalf of the appellee, to exclude the $8,252.42 paid out for McPike & Johnston's drafts on McPike after the first day of November, 1880, for McPike's testimony shows that these mules and plantation supplies were purchased for and used in making the crops in Hinds County

during the year 1880, and it must be evident to the court that they were so purchased even before the first day of November, 1880 ; and Harrison & Lewis would have been responsible to McPike for any damages he might have sustained in case they had refused to advance to him, after the third day of May, 1880, and previous to the first day of January, 1881, such sums of " money, supplies, and merchandize " as he might demand of them, for any use or purpose he might wish to make of them. Apart from the powers and discretion resting in Gray, as trustee under this deed of trust, we insist that, under the admissions of the attorneys for the appellee and of the Circuit Court, under the first instruction given to the jury on behalf of the appellee, neither Harrison & Lewis nor Gray, as their trustee, was chargeable with any portion of the two thousand seven hundred bushels of corn used by the mules and horses, and that neither of them was chargeable with any portion of the corn levied on except what was unused at the time the horses and mules were sold, on the 25th of April, 1881, under the deed of trust. The admissions by the court and attorneys for appellee, in the first instruction given for the appellee, before referred to, were to the following effect : That the trust property was liable for all advances by Harrison & Lewis after the first day of November, 1880, on account of the crops of 1880, such as " bagging and ties, money to pay cotton pickers and discharge paramount liens in favor of laborers on the crop, supplies for the laborers engaged in harvesting and preparing the crop for market, and such other incidental expenses as are usual and proper in securing and preparing a cotton crop for sale." If the feeding and working of these mules and horses for ginning, baling, and hauling to market the crops of cotton on two large plantations are not to be regarded as " such incidental expenses as are usual and proper in securing and preparing a cotton crop for sale," it would be difficult to say what could constitute such incidental expenses.

*T. J. Wharton*, made an oral argument also.

*Nugent & McWillie*, for the appellee.

What does the closing stipulation in the deed of trust mean? "It is further distinctly understood and agreed between the parties aforesaid, that this deed is made and intended to secure any advances on account of the crop of 1880, made after the maturity hereof, and not mentioned herein." The preamble of the deed recites that the parties expected Harrison & Lewis to advance McPike money, supplies, and merchandize during the year 1880, on the condition that if he paid on or before the 1st of November, 1880, what may be due Harrison & Lewis as aforesaid, and all costs incurred on account of the deed, it was to be void. Taking the two clauses together, it seems to us fairly inferable that the advances made prior to November 1, 1880, were to be of a general character, not expressly limited to the ordinary plantation transactions, and those after that date to such advances as were expressly made on account of the crops of that year. The court below held that these latter included only bagging and ties, money to pay cotton pickers, discharge paramount liens in favor of laborers on the crop, supplies for the laborers in harvesting and preparing the crop for market, and such other incidental expenses as are usual and proper in securing and preparing a cotton crop for sale, which would have been proper without the stipulation, perhaps, and do not include mere general debts of the grantor, McPike, which may have been paid for him by Harrison & Lewis after the 1st of November, 1880; and instructed the jury to exclude, in their calculation of liens, $8,252.42, the same being amount paid out by Harrison & Lewis on drafts of McPike & Johnston on H. C. McPike.

If this charge did not correctly interpret the deed, then, under cover of the stipulation, Harrison & Lewis could have contracted, after November 1, 1880, to pay out money for McPike, upon any consideration, and charged the same upon the mortgaged property; and the deed would have been necessarily fraudulent and void. Certainly it would have been void

for uncertainty, as containing nothing on its face which could have fixed the amount to be advanced.

There were three thousand bushels of corn attached, which was shown to be worth $2,250. The corn was replevied by Gray, trustee, and was turned over to and consumed by McPike. By the terms of the trust-deed, Gray was required to sell this corn on ten days' notice. In lieu of this, he delivered it up to Mc-Pike, who used it in feeding the mules, while he employed them to cultivate his lands. The court below allowed a credit in favor of the claimant for ten days' feed for the mules attached, and no more; and we cannot see that there was any error in this.

There is but one other point on the exceptions to the instructions for the plaintiff below. McPike knew that the McPike & Johnston drafts were to pay for mules which they had purchased for him, or for pork or other supplies; and it is urged that this fact lends sanction to the theory that the payment of these drafts would give Harrison & Lewis a right to charge the amounts upon the trust property. The court charged otherwise, and, we think, correctly. The debt to McPike & Johnson was a mere general debt, if a debt at all.

*W. L. Nugent*, of counsel for the appellee, argued the case orally.

*W. P. & J. B. Harris*, on the same side.

If the court's construction of the deed of trust was correct, the instructions announced the legitimate consequence. Was it correct? It will be observed that the scope of the deed as to advances, as it is measured by the first part of the deed, and that which is to be measured by the supplemental paragraph at the close, which was the measure of advances to be made after " maturity " of the debt and deed, as provided in the first and principal provision, is different. The first is very broad, embracing all advances of " money, supplies, and merchandise." The last is confined to advances " on account of the crops of 1880, made after the maturity hereof." There is a manifest intention to narrow the margin of advances after

the principal debt shall have matured ; and this purpose is not answered by limiting the advances to such as might have some connection, however indirect, with the crop of 1880. The security which the creditor took for the principal debt was, in great part, a growing crop, which, when that debt was to mature, would not be in a condition to be sold advantageously, should the debtor make default. Much of it would, at that date, remain to be gathered and prepared for market. The parties must be supposed to have foreseen that, after the right to proceed under the deed of trust had become complete, it might become necessary, for the preservation of the crop, to make additional advances for that purpose. The debtor might not be able to meet the expenditure necessary. The creditor, in order to protect himself for advances on account of a crop matured, but still in the field, and which was his security for the matured debt, required the insertion of the after paragraph for the protection of such advances. This explains the presence and the position of the supplemental clause in the deed. The object of the clause is obvious, and that object limits its operation. The advances secured by the leading provisions of the deed, although without limit as to amount, and apparently as to character, are limited by the force of the deed to advances to be made between the date of the deed and the 1st of November, 1880 — a very important limitation. No advances after that date, for any purpose, would be protected by it.

If we take the ordinary contract between the supply-man and the farmer, the terms " advances on account of the crop " of the current year (whether we seek to define the obligation of the creditor to make the advances or to measure the scope of the security given by the debtor for the advances), would be held to import advances for necessities thereafter to arise in the cultivation and preservation of the crop, and not advances to pay debts to other persons previously contracted on account of the crop. We at once perceive that without express words, advances for such an object would be excluded in any controversy between the secured creditor and the debtor.

*W. P. Harris*, also made an oral argument.

Chalmers, J., delivered the opinion of the court.

The first clause of the trust-deed clearly secured all future advances of whatever description, without regard to their date, and brought the case fairly within the principle announced in *Witzinski* v. *Everman*, 51 Miss. 841, to-wit: That such a mortgage, when recorded, operates to secure the mortgagee against the claims of third persons in whatever advances are made under it, whether before or after the maturity of the principal debt secured. But for the last clause of the instrument it is clear that the attaching creditor must be postponed until every valid debt due the mortgagee has been satisfied. That clause is in these words: "It is further distinctly understood and agreed between the parties aforesaid that this deed is made and intended to secure any advances on account of the crop of 1880, made after the maturity thereof and not mentioned therein."

These bonds must be held to limit advances, after maturity of the principal debt named (1st of November), to such as should be " made on account of the crop of 1880," and as excluding all post-maturity advances which were not of that character. It is impossible to give them any force or meaning except upon this theory. Without them all advances, whether made before or after maturity, and whether on account of the crop or not, were alike protected. The last clause, therefore, could not have been inserted to enlarge an instrument which needed no enlargement, but rather as a limitation of that which without it was too general and all-embracing. By it the post-maturity advances are restricted to such as are directly connected with the growing, gathering, and handling of the crop, and all others are excluded. The court below adopted this construction and excluded advances made after the maturity, and which consisted in paying off various debts due by the mortgageor to other persons.

These payments were made at the request of the mortgageor, and the original consideration of the drafts was mules and provisions bought for and used in making the crop; but it was

not shown that the mortgagees, had any connection with them in their inception, or even knew of their existence, until long after the maturity of the trust-deed. They were properly held not to be covered by the security.

We think that the court below held the trustee to a responsibility too rigid in declaring that it was his duty to have sold the mules covered by the mortgage on the tenth day after they were delivered to him, and in allowing him for the expense of feeding them for that length of time only. The interests at stake were large, the attachment was sudden, and some time should have been allowed the trustee for looking into the attachment, for consultation with the *cestuis que trust*, and for determining on his own course. He might, we think, well be allowed ten days for these purposes and a like period for advertising under the trust-deed. If *remittitur* on this basis is entered here the judgment will be affirmed, otherwise it must be reversed.